**NO. 25-40537 &25-40610**

# United States Court of Appeals
## for the Fifth Circuit

**UNITED STATES OF AMERICA**
*Plaintiff-Appellee*,

**V.**

**STEVEN W. DONOFRIO**
*Defendant-Appellant*.

On Appeal from the United States District Court
for the Eastern District of Texas
Texarkana Division, No. 19cr00025-5

# APPELLANT STEVEN DONOFRIO'S OPENING BRIEF

*/s/ Andrew S. Feldman*
Feldman Firm PLLC
2 South Biscayne Blvd, Suite 2530
Miami, Florida 33131
Office: 305.714.9474
Email: afeldman@feldmanpllc.com
*Attorneys for Appellant Steven Donofrio*

## CERTIFICATE OF INTERESTED PERSONS

I certify that the following individuals may have an interest in the outcome of this case. I make these representations in order that the members of this Court may evaluate possible disqualifications or recusal.

1. United States of America
2. Honorable Robert W. Schroeder, III, United States District Judge
3. Honorable James Boone Baxter, United States Magistrate Judge
4. Phillip Lamb
5. David W. Klaudt
6. Michael W. McCrum
7. Jared Robert Weir
8. Paul Edward Coggins
9. Nicolas Arroyo
10. William Bryan Mateja
11. Samuel J. Louis
12. Jim E. Lavine
13. William Flowers
14. Cory Jon Floyd
15. Brian Richard Zeeck
16. Daniel Purdom
17. Steven Donofrio
18. Andrew Simmons Feldman
19. Jeffrey Scott Harrelson
20. Robert Charles Blume

21. Reid Francis Rector
22. James J. Walker, Jr.
23. Gene Ross Besen
24. Scarlett Singleton Nokes
25. Elish Jonathan Kobre
26. Timothy Armstrong
27. Michael Phillip Levine
28. Ryan Rouz
29. Virginia Blake Herrin
30. Jeffrey Harless Lehman
31. Patrick Ridgeway
32. John M. Colette
33. Chismere Mallard
34. George R. Milner
35. Thomas Plas Wynne
36. Ray W. Ng
37. Daniel K. Hagood
38. Jennifer Marie McCoy
39. Kiprian Edward Mendrygal
40. Loretta Alexandra Hunt
41. Ashley Kretzschmar
42. Brady Thomas Wyatt
43. Randy S. Myers

44. Michael Andoscia
45. Sean T. O'Leary
46. Gene Matrix LLC
47. Nathaniel Christopher Kummerfeld
48. Adrian Garcia
49. Brent Lloyd Andrus
50. Laurel Franklin Coan, Jr.
51. Laurel Parker Simmons
52. Lucas Ryan Machicek
53. Stephen Edward Oestreicher, Jr.
54. Michael Uhl
55. Robert Webster
56. Buck Files
57. Richard Roper
58. Dunn Law Firm, PA
59. Kristin Halbert
60. Jody Rudman
61. Christie Drake
62. Julie Heideman
63. Diana Rollins
64. Derek Wong
65. Dr. John Derminjian
66. Jeff Forrest

*/s/ Andrew S. Feldman*

STATEMENT REGARDING ORAL ARGUMENT

Steven Donofrio requests oral argument. This is the second appeal in this case. It comes after this Court vacated Mr. Donofrio' sentence, *United States v. Donofrio,* 2025 WL 1443577 (5th Cir. May 23, 2025), and after the district court resentenced Mr. Donofrio from 41 months to 24 months.

This appeal raises significant, novel questions related to the evidence the government must present at sentencing to support a district court's calculation of the *value of the bribe* under 2B4.1 in future kickback cases.

Equally as significant, the appeal raises important questions about the standard employed by the district court to find forfeiture in this Circuit. The forfeiture order here was contrary to the standards in at least two of this Circuit's prior decisions. *United States v. Ayika* 837 F.3d 460, 472-74 (5th Cir. 2016) (vacating forfeiture order in health care fraud case); *United States v. Dass,* 2023 WL 1529713 (5th Cir. Feb. 3, 2023) (vacating forfeiture order in kickback case). And, the order conflated fraud with kickbacks.

Finally, it raises questions about the discretion a district court maintains to deny a variance under 18 U.S.C. Section 3553(a)(1) based on the history and character of Donofrio and the nature and circumstances of the offense.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .......... 1

STATEMENT REGARDING ORAL ARGUMENT .......... 4

STATEMENT OF JURISDICTION .......... 10

STATEMENT OF ISSUES PRESENTED FOR REVIEW .......... 11

STATEMENT OF CASE .......... 12

STATEMENT OF FACTS .......... 21

SUMMARY OF THE ARGUMENT .......... 43

ARGUMENT AND AUTHORITIES .......... 47

ISSUE ONE: THE DISTRICT COURT CLEARLY ERRED IN FINDING THAT THE VALUE OF THE BRIBE AMOUNT UNDER 2B4.1 WAS $109,000 BASED ON A PREPONDERANCE OF EVIDENCE. .......... 47

Standard of Review .......... 47

Argument .......... 49

ISSUE TWO MR. DONOFRIO'S FORFEITURE ORDER MUST BE VACATED BECAUSE THE DISTRICT COURT SPECULATED AS TO THE TOTAL AMOUNT OF MONIES OBTAINED DIRECTLY OR INDIRECTLY BY MR. DONOFRIO FROM THE OFFENSE OF CONVICTION .......... 55

Standard of Review ..... 55

Argument ..... 56

ISSUE THREE: THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED MR. DONOFRIO'S REQUEST FOR A DOWNWARD VARIANCE UNDER 18 U.S.C. SECTION 3553(A). ..... 60

Standard of Review ..... 60

Argument ..... 60

CONCLUSION ..... 65

CERTIFICATE OF SERVICE ..... 65

# TABLE OF AUTHORITIES

**Cases**

*Libretti v. United States*, 516 U.S. 29, 39 (1995), ........ 55

*Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) ........ 47

*United States v. Ayika*, 837 F.3d 460, 467 (5th Cir. 2016) ........ 48, 55, 57, 59

*United States v. Dass*, 2023 WL 1529713 (5th Cir. Feb. 3, 2023) ........ 57, 59

*United States v. Donofrio*, 2025 WL 1443577 at *10 (5th Cir. May 23, 2025), .... passim

*United States v. Juluke*, 426 F.3d 323, 326 (5th Cir. 2005); ........ 55

*United States v. Lawrence*, 47 F. 3d 1559, 1566 (11th Cir. 1995 ........ 47

*United States v. Polin*, 690 F. Supp. 2d 415, 427-28 (W.D. Va. 2010) ........ 56

*United States v. Ricard*, 922 F.3d 639, 657 (5th Cir. 2019). ........ 47

*United States vs. Alfaro*, 919 F.2d 962. 965 (5th Cir. 1990 ........ 48

*United States vs. Marchetti*, 96 F. 4th 818 (5th Cir. 2024) ........ 18, 43, 44

*United States vs. Simpson*, 796 F. 3d 548, 558 (2015 ........ 60

**Statutes**

18 U.S.C. § 3742 ........ 10

18 U.S.C. Section 3553(a) ........ 60

18 U.S.C. Section 982(a)(7). ........ 56

28 U.S.C. § 1291 ........ 10

U.S.S.G. Section 1B1.3(a)(1)(B ........ 54

U.S.S.G. Section 2B4.1 ........ 64

**Rules**

28 U.S.C. Section 753(b). .......... 14

Fed. R. App. P. 4(b)(1)(A) .......... 10

## STATEMENT OF JURISDICTION

Donofrio appeals the Amended Judgment of Conviction and Sentence the district court imposed on August 20, 2025. Dkt. No. 1092. The district clerk entered the Judgment of Conviction and Sentence on August 20, 2025. *Id.* Donofrio filed Notice of Appeal on September 2, 2025. Dkt. No. 1102.

The district court entered the final order of forfeiture on December 15, 2023. Dkt. No. 1106. Donofrio filed a Subsequent Notice of Appeal on September 24, 2025. Dkt. No. 1107

This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Fed. R. App. P. 4(b)(1)(A)

STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether the district court erred when it found by a preponderance of the evidence that the *value of the bribe* under U.S.S.G Section 2B4.1 was $109,000 based on the amount of monies Codon received from Althea when the court received no specific or reliable evidence from the government demonstrating that the monies from Althea to Codon were connected to a requisition switching scheme (Vantari to Althea) which resulted in $109,000.
2. Whether the district court erred in applying 18 U.S.C. Section 982(a)(7) to find that the forfeiture amount of $84,213.19 – which was the total money transferred from Codon to Genematrix -- constituted or was derived directly or indirectly from gross proceeds traceable to the Vantari-Althea lab requisition switching scheme.
3. Whether the district court abused its discretion in denying (again) Mr. Donofrio's request for a downward variance under 18 U.S.C. Section 3553(a) when the nature and circumstances of the offense were fundamentally distinguishable from conduct committed by each of the other defendants in this case and when the district court affirmed that the court had never seen so many sentencing letters

attesting to Mr. Donofrio's character from so many people during the district court's career on the bench.

## STATEMENT OF CASE[1]

On or about December 19, 2020, Steven Donofrio was arrested in his home in front of his two minor daughters and his wife, after a grand jury returned a 12-defendant One Count Indictment accusing Mr. Donofrio of conspiracy to violate the federal Anti-Kickback Statute (AKS). ROA. 23-40586. 52-111

The government superseded the indictment but did not add any counts or additional facts to the indictment regarding Mr. Donofrio. (ROA.315-365).

First Trial: Mistrial for Mr. Donofrio

On November 15, 2021, Mr. Donofrio proceeded to trial with Dr. Ray Ng and Vincent Marchetti. At trial, the government called 18 witnesses.

---

[1] Citations from the record on appeal for *U.S. vs. Steven Donofrio*, 23-40586 (5th Cir. 2024) are reflected as ROA.23-40586.0000 (page number). The citations from this ROA are **ROA. 2886-3119 (Exhibits introduced during resentencing hearing); ROA. 10688-10898 (resentencing hearing); ROA. 3178-3180 (forfeiture order).** When the ROA was created for this appeal, there were no ROA numbers populated for the electronic record on appeal for 23-40586 but citations are necessary for context.

Mr. Donofrio moved orally for a judgment of acquittal and presented his defense case. Mr. Donofrio was the only witness he called in his case. On December 16, 2021, the jury returned verdicts: not guilty for Dr. Ng, guilty for Mr. Marchetti, and no verdict for Mr. Donofrio. (ROA 1453). The court declared a mistrial for Mr. Donofrio. Mr. Donofrio then filed a motion for judgment of acquittal ROA. 23-40586.2581, ROA. 23-40586. 2665, ROA. 23-40586. 2201-2285, which the district court denied. ROA. 23-40586. 1530-1545. A retrial was scheduled. ROA. 23-40586. 1648-49.

Second Trial: Guilty Verdict

The government introduced as witnesses: Sean Parrish, Nicolas Arroyo, Raj Desai, JJ Rudy, Virginia Herrin, and FBI Agent Jason Rennie. ROA. 23-40586. 7320-8995.

Mr. Donofrio moved for a judgment of acquittal, ROA. 23-40586. 8996-9019, which was denied. ROA. 23-40586. 9019-9022.

Mr. Donofrio presented his case and testified. ROA. 23-40586. 9036-9495. Sales and marketing professionals, Julie Heideman (Michigan), Derek Wong (Arizona), Diana Rollins (Missouri), and Jeff Forrest (Georgia), testified for Mr. Donofrio. Dr. John Derminjian (California) testified as a character witness. ROA. 23-40586. 9497-9631.

The jury rendered a verdict of guilty on Count One as to Mr. Donofrio. ROA. 23-40586. 2282. Mr. Donofrio moved for a judgment of acquittal, ROA. 23-40586. 2302-2339, which was denied. ROA. 23-40586. 2401-2429).

Sentencing

Mr. Donofrio objected to the PSR, ROA. 23-40586. 11936-11956, and the value of the bribe pursuant to 2B4.1. ROA. 23-40586. 11938-11950. Mr. Donofrio filed a sentencing memorandum with dozens of letters and Exhibits. ROA. 23-40586. 13016-13492, ROA. 23-40586. 13517-13870.

At sentencing, Patricia Courville testified. ROA. 23-40586. 9901-9955. Exhibits were introduced to challenge the value of the bribe under Section 2B4.1. ROA. 23-40586. 9863 (listing SD 1, 2, 3, 3A, 4A, 29, 30, and 31 as admitted Exhibits); ROA. 23-40586. 13168-13187; ROA. 23-40586. 13521-13543.

Mr. Donofrio objected to the government's proposed calculation of the value of the bribe under Section 2B4.1 ROA. 23-40586. 9965:12-14; ROA. 23-40586. 9974:13-17; ROA. 23-40586. 9978:13-16, ROA. 23-40586. 9987:9-10. The court overruled that objection. ROA. 23-40586. 9986:10-14.

After Mrs. Courville's testimony concluded, the court conducted a 40-minute off-the-record conference in its chambers with counsel for Mr. Donofrio and the government.[2] Once the court returned to the bench, the court denied the objection to 2B4.1. ROA. 23-40586. 9982-9983, ROA. 23-40586. 9986-9987, and the motion for a variance. ROA. 23-40586. 10051-10052.

Forfeiture

The parties stipulated that the forfeiture amount of $769,000 was based on the mathematical calculation of activity-based payments that were made by Vantari to Genematrix according to the 126 series of Exhibits. ROA. 23-40586. 2458. Mr. Donofrio insisted on a specific clause in the stipulation to ensure that he did *not* waive any appellate right to challenge that amount. ROA. 23-40586. 2548-2549. The court entered a final order, ROA. 23-40586. 2552-2553, which Mr. Donofrio appealed. ROA. 23-40586. 2572-2573.

[2] The conference appears to have at least technically violated the plain language of the Court Reporters Act found at 28 U.S.C. Section 753(b).

First Appeal to the Fifth Circuit

Mr. Donofrio appealed his conviction and sentence and forfeiture order. Dkt. Nos 971 and 1010. This Court concluded that the Vantari conduct untethered to the Althea-Codon conduct – which comprised 90% of the evidence introduced at both trials – was insufficient to convict Mr. Donofrio of a conspiracy to violate the Anti-Kickback statute:

> At least with respect to Donofrio's activity, the Government has not provided sufficient evidence demonstrating that Genematrix influenced any physicians or other medical professionals, or received any type of referral for Vantari conduct. ……
>
> That is, to the extent that "Arroyo's express intent was to pay Donofrio in return for arranging Medicare business," Donofrio was advertising in the eyes of the AKS. And that is not changed by the decision to call payments activity-based compensation. The bar for sufficiency may be low, but "[f]or a rational trier of fact to find a violation of the AKS, the government needs to prove *some* evidence that" the relationship between Donofrio and relevant decisionmakers was more like the *Shoemaker* scheme and less like the *Miles* scheme.[14] *Marchetti*, 96 F.4th at 827. As in *Marchetti*, even if this conduct "was undoubtedly sketchy and maybe even criminal," *id.* at 824, the conviction may not stand on this conduct alone.[3]

[3] *United States v. Donofrio*, 2025 WL 1443577 at *10 (5th Cir. May 23, 2025),

But this Circuit also held that the same conduct which was the basis for affirming Mr. Marchetti's conviction was sufficient to state a violation of the AKS:

> However, the Codon activity violates the AKS and can therefore serve as an unlawful objective. …… The evidence presented at trial shows that Donofrio was involved in this conduct.[15] The individuals involved in the Codon activity became the relevant decisionmakers: they influenced selection of services without letting the patient or physician decide. Of course, these acts resulted in payment to Donofrio. "That is a substantive AKS violation." *Id.*
> To the extent that Donofrio challenges his involvement, a reasonable jury could have found otherwise.[4]

That decision was also based, in large part, on the court's recitation of the facts surrounding the Codon diversion scheme:

> Arroyo created Codon DX Services, LLP ("Codon") and hired a friend to lead the company. Codon then teamed up with a Vantari competitor, Althea, after Donofrio introduced Arroyo to Althea's CEO. Arroyo developed a scheme in which Codon packaged Althea test swabs in kits with Vantari forms. Medical providers, believing that they ordered a Vantari test, would instead unknowingly use an Althea test swab. The medical providers would then send the Althea test and Vantari forms to a distribution center in Tempe, Arizona.
>
> At the distribution center, a Codon employee divided the tests into those billed to private insurance and those billed to Medicare. If the test was billed to private insurance, they would forward it to the Vantari lab. But

---

[4] *Donofrio,* at *11.

> if it was billed to Medicare, they would repackage the test to resemble one from Althea and ship it to Althea's lab. Althea would then pay Codon a fifty percent commission on the Medicare reimbursements. Through this scheme, Codon acted as a conduit for Medicare reimbursements after Vantari's cessation of such activity, providing a way to "continue to get non-government tests through the door" while also "redirect[ing] government payors down to Althea so the distributors would be fulfilled from their perspective."[1]
>
> Arroyo's girlfriend, Jessica Conn, worked on this project. Her duties existed almost exclusively when Medicare reimbursement orders were delivered, in which case she would transcribe physician-provided information from Vantari forms to Althea forms. The forged forms were then sent to the Althea lab with the swab.[5]

Importantly though, this Court vacated Mr. Donofrio's sentence and forfeiture order and remanded for resentencing to the district court. [6] This Circuit found that the district court erred in its calculation of the Guidelines when it used the non-criminal payments from Vantari to Genematrix ($769,000) to calculate the 2B4.1 value of the bribe.[7] This court reinforced, however, that the district court "may have properly found that the $84,213.19 that Genematrix received from Codon violated the law by a preponderance of the evidence, but that *Marchetti*'s holding and ours today compel the conclusion that the remaining payments

---

[5] *Donofrio,* at *3-4.
[6] *Donofrio,* at *17
[7] *Id.*

[Vantari to Genematrix]—stemming from non-illegal activity—cannot be used to increase Donofrio's sentence."[8] And so, this Court vacated the sentence and remanded for resentencing.

Resentencing Hearing

On August 19, 2025, the district court held a full-day resentencing hearing where the defense called Special Agent Jason Rennie and Patricia Courville as witnesses. Given this court's decisions in *Marchetti* and *Donofrio I*, Mr. Donofrio introduced dozens of Exhibits which were not part of any of the prior proceedings to support his position that the government failed to demonstrate the value of the bribe. The government relied mostly on argument and trial transcripts from the first trial. The government introduced no new exhibits or information and called no witnesses.

Despite this, the district court found that the value of the bribe was $109,000 and cited a passage from *Donofrio I* in which this Circuit previously affirmed Mr. Donofrio's conviction. ROA. 10861-10862. The

[8] *Id,* citing *United States vs. Marchetti,* 96 F. 4th 818 (5th Cir. 2024)

court did so even after finding that "the evidence is not perfect. ***It is not mathematical. It does not approach mathematical."*** [9]

The court then determined that the Guidelines range was a Level 16 (21-27 months). Level 16 was based on a base offense level 8 under 2B4.1 and an additional 8 levels under 2B1.1(b)(1)(E) because the value of the bribe was more than $95,000 but less than $150,000.00. The court then sentenced Mr. Donofrio to 24 months denying (again) his request for a variance under the 18 U.S.C. Section 3553(a) factors. ROA 10886.

Amended Forfeiture Order

The court ordered the parties to file briefing on the forfeiture issue following the resentencing hearing. The parties did so.[10] The court then found that the forfeiture amount was $84,213.19.[11] Mr. Donforio appealed. Dkt. No. 1107.

---

[9] ROA. 10862-10864.

[10] Dkt Nos. 1100, 1101, 1105.

[11] Dkt. No. 1106 (Order of Forfeiture); ROA. 3178-3180.

## STATEMENT OF FACTS

Steven Donofrio

Mr. Donofrio is a girl dad with two daughters who lives in Temecula California. ROA. 23-40586. 9037. Dr. John Derminjian described Steve as "***without any doubt…one of the most honest people I've ever known.***" ROA. 23-40586. 9624. Mr. Donofrio was described as truthful and honest by Julie Heideman, Diana Rollins, and Derek Wong. ROA. 23-40586. 9516, ROA. 23-40586. 9556, ROA. 23-40586. 9593.

Genematrix Begins

In 2014, Mr. Donofrio, a sales and marketing professional with experience at large companies like Don Joy Orthopedic, ROA. 23-40586. 9039-9042, linked up with Craig Lissner and Eric Rhode, and attorney Clay Patterson, ROA. 23-40586. 9057, to establish Genematrix as a Nevada limited liability company with its headquarters in Bloomington, Illinois. ROA. 23-40586. 9050. Mr. Donofrio and Mr. Lissner were successful in the health care sales and marketing industry. ROA. 23-40586. 9048-9050. Rachel Buckner and Patricia Courville worked for Genematrix in operations and accounting. ROA. 23-40586. 9055-9057. Genematrix contracted with clinical laboratories other than Vantari,

including Althea, Gene ID, ExcelTox, Molecular Testing Labs (MTL), and UTC. ROA. 23-40586. 9066-9070

Genematrix was a Sales and Marketing Organization

Genematrix was a sales and marketing organization with Fifty to Two Hundred sales representatives, ROA. 23-40586. 9046, ROA. 23-40586. 11698, ROA. 23-40586.9504, and marketed Vantari's genetic tests through independent sales representatives. *Id.* Mr. Donofrio managed and trained the sales representatives on a daily basis. ROA. 23-40586. 9053.

A genetic test was ordered by a doctor who signed a requisition form which displayed the word Vantari on the Form. ROA. 23-40586.8094.

Sean Parrish testified that Genematrix and its sales representatives provided education and performed the activities listed in its contract with Vantari under Schedule A. ROA. 23-40586. 13545-13548. Arroyo testified similarly. ROA. 23-40586. 8345-8346.

Julie Heideman testified that she was a sales representative for Genematrix marketing Vantari, ROA. 23-40586. 9504, that her job was to market and educate doctors regarding Vantari's pharmacogenetic tests, ROA. 23-40586. 9505, ROA. 23-40586.9511, and, that doctors

decided to refer tests to Vantari, not Mrs. Heideman. ROA. 23-40586. 9524.

Derek Wong testified that when he worked as a sales representative for Genematrix, he educated physicians about Vantari's genetic tests, and did not "recommend" anything to doctors. ROA. 23-40586.9596. Derek gave the physicians as decision makers an understanding of the product or test so they could make a decision about who and what to use in their practices. ROA. 23-40586. 9595.

Diana Rollins testified that Genematrix was a tight and organized sales and marketing organization with policies and procedures, ROA. 23-40586. 9550-9551, and that Genematrix performed sales and marketing activities including education. ROA. 23-40586. 9552-9553.

Jeff Forrest testified that he worked as a sales representative for Genematrix and tried to introduce and educate doctors about products that were favorable to their patients' outcomes, ROA. 23-40586. 9609, that he completed activity forms, and marketed Althea's genetic testing for Genematrix. ROA. 23-40586. 9614-9618.

Patricia Courville testified that "***Genematrix was a marketing company,*** and we had – they had different contracts for different laboratories, and we had reps that would go out and market the different services that those labs had." ROA. 23-40586. 9904:13-16.

FBI Agent Jason Rennie testified that he had not identified any evidence that Genematrix or any of its sales representatives paid doctors, induced doctors, or used physician registries to induce doctors. ROA. 23-40586. 8850-8851.

**April 2014**: The Vantari Genematrix Relationship Begins

Vantari was a clinical laboratory specializing in pharmacogenetic testing, ROA. 23-40586. 9547, which is run to see how someone metabolizes medication and it is a once-in-a-lifetime test run by physicians and providers within a hospital setting or a long-term care setting who know how to prescribe medication. ROA. 23-40586. 9500. Genetic testing also saves lives. ROA. 23-40586. 9548, ROA. 23-40586. 13188.

In April of 2014, Genematrix contracted with Vantari to market its pharmacogentic tests. ROA. 23-40586.10167-10171. Genematrix would be paid by Vantari based on a percentage of collections from all payers, including government payors and commercial payors. ROA. 23-40586.

10167-10171. Genematrix' attorney, Clay Patterson, created dozens of contracts for Genematrix with independent sales and marketing representatives throughout the country which contained this same compensation structure. ROA. 23-40586.9196-9201. Mr. Patterson drafted, approved, and signed those contracts including contracts with Space 22 and Kristin Halbert and Julie Heideman. ROA. 23-40586. 11765-11773, ROA. 23-40586. 11776-11785, ROA. 23-40586. 11535-11544, and ROA. 23-40586.11688-11697; ROA. 23-40586. 11825-11837, ROA. 23-40586. 9196-9201.

On June 4, 2014, Mr. Patterson even advised that a specific percentage-based contract "was acceptable under the AKS" and that "I favor the percentage approach"[12] Similarly, in October 10, 2014, Mr. Patterson advised Mr. Donofrio and Mr. Lissner to change a provision in a draft contract, ROA. 23-40586.11851-11870, and exclaimed "why would anyone agree to not receive any commissions on tests that are reimbursable by any Federal Health Care program." ROA. 23-40586. 11849-11850.

---

[12] ROA. 23-40586.11774-11775

**September 2014:** Genematrix Contracts with the Lab Althea

Genematrix entered into a marketing contract to perform sales and marketing for a separate lab, Althea, which provided pharmacogenetic testing. ROA. 23-40586. 11565-11581. Mr. Donofrio had a professional relationship with its CEO, Greg Hamilton, and vice president of sales, Noah Nasser. ROA. 23-40586. 9202-9203.

Genematrix based on lawyer Clay Patterson's advice, executed contracts with Althea which authorized percentage-based compensation. ROA. 23-40586.11786-11824, ROA. 23-40586.11565-11581. Upon execution of these contracts, Genematrix' independent sales representatives marketed Althea's tests to doctors in New York, New Jersey, Florida, and Texas. ROA. 23-40586. 9066-9071.

**March 2015**: Nick Arroyo Creates Codon and Gathers Sales and Marketers from ALS, Genematrix, and Vantari

Genematrix had a marketing contract with Althea. ROA. 23-40586. 11565-11581. In or around March of 2015, Mr. Donofrio introduced Nicolas Arroyo to Noah Nasser and Greg Hamilton at Althea, ROA. 23-40586.8253, to establish a lab-to-lab arrangement or "reference agreement" between Althea and Vantari. ROA. 23-40586. 8254.

When that agreement did not come to fruition, Althea and Codon executed a marketing contract. ROA. 23-40586. 8324. Nicolas Arroyo and Sean Parrish created Codon but, on paper, Arroyo's high school friend, Adam Matz, was the manager. ROA. 23-40586. 8325.

**But who would market genetic tests to doctors' offices under Codon?** According to Arroyo, the intent of Codon was for Arroyo and Parrish to establish a marketing organization outside of Vantari that could market products outside of Vantari. ROA. 23-40586. 8331-8333.

To do that Arroyo leveraged Genematrix's preexisting relationship with Althea (and the Genematrix marketers who were already marketing Althea not Vantari). Arroyo also leveraged his relationship with Marchetti and ALS and its sales representatives. ROA. 23-40586. 8330-8333. Arroyo had a relationship with Exceltox, a competing lab, and was able to use the Codon brand to market Exceltox tests using a combination of sales representatives from ALS, Genematrix, and Vantari. ROA. 23-40586. 8330-8333. And so, while Codon may have only had 1 employee, its sales and marketing force was a co-branding between ALS, Genematrix, and independent sales representatives who were also marketing Vantari. ROA. 23-40586. 8330-8333.

To effectuate this co-branding, on **April 13, 2015,** Codon entered into a joint marketing agreement with Genematrix which was signed by attorney Clay Patterson and reviewed by Codon's attorney prior to its execution. ROA. 23-40586. 11838-11348. The joint marketing agreement contemplated a joint marketing relationship between Codon and Genematrix where Genematrix would also benefit from the marketing efforts of Codon sales representatives since some of the Codon sales representatives were Genematrix representatives who were marketing Althea tests to doctors in New York, New Jersey, and Florida. ROA. 23-40586. 11839-11348.

On **April 14, 2015**, and because Mr. Donofrio and Genematrix were already marketing Althea tests to physicians, Mr. Donofrio forwarded an Althea requisition form in an email to Mr. Arroyo and stated that he could have his "best guy in Florida" provide training to "our girl in Phoenix" with respect to the forms. ROA. 23-40586. 11660-11662; ROA. 23-40586. 8379.[13] That "best guy" was Glenn Castillo and was marketing

---

[13] Mr. Donofrio recognizes that this Court addressed this issue in the first appeal but we include it here for context of the relationship between Althea and Genematrix.

Althea tests to doctors. The forwarded form was from Glenn Castillo. ROA. 23-40586. 11660-11662; ROA. 23-40586. 8379

**And how would Codon earn money and then pay Genematrix and the other sales organizations?** Codon received $109,000 directly from Althea and other monies from Excel laboratories for toxicology testing. ROA. 23-40586. 8370-8371. Codon then paid Genematrix and Advanced Life Sciences for marketing those products. ROA. 23-40586. 8370-8371. Mr. Donofrio played no role in the management of Codon nor did Mr. Donofrio have access to its bank accounts. Arroyo, as the true owner of Codon, controlled the flow of any funds Codon received from the laboratories Althea or Exceltox and controlled what was transferred to Genematrix.

The Vantari-Althea Medicare Diversion Scheme is Supposedly Hatched with Jessica Conn and Tempe Arizona as the Base of Operations

More critically here, Arroyo's girlfriend, Jessica Conn, who was the lone Codon employee, with a start date of May 30, 2015, ROA. 23-40586. 11677-11683; ROA. 23-40586. 8088, was assigned to a special project at Vantari's warehouse in Tempe, Arizona. ROA. 23-40586. 8088. There, Conn would supposedly cherry pick the Vantari orders for Medicare patients and switch those orders to Althea orders for those same

Medicare patients. ROA. 23-40586. 8093 Conn would do this by transcribing information from the completed Vantari requisition forms to an Althea requisition form. ROA. 23-40586. 8093. Arroyo went further and testified that Conn forged requisition forms including completing the medical necessity portion of the form. ROA. 23-40586. 8104-8105. Arroyo saw her do it one time but there is no evidence of a single switched requisition form. Just Arroyo's say-so. ROA. 23-40586. 8104-8105.

Arroyo testified that this idea of switching Vantari lab orders to Althea lab orders originated when Vince Marchetti urged Arroyo to use one swab to avoid confusion between Vantari and Althea tests at the doctors' offices. ROA. 23-40586.8090, ROA.23-40586.8092-8093. Marchetti did not want his marketers at ALS to be tasked with two sets of paperwork (Althea and Vantari requisition forms) and two sets of swabs (Althea and Vantari) for lab testing. ROA. 23-40586.8090, ROA.23-40586.8092-8093.

Moving forward, Althea swabs were used for both Vantari and Althea tests at the doctors' offices. ROA. 23-40586.8092-8093. But then Mr. Marchetti "pushed back" and wanted to "simplify the process further" and so Vantari requisitions (one set of paperwork) were sent to offices

"out in the field." ROA. 23-40586.8092. The doctor's office would use an Althea swab and order a Vantari test using a Vantari requisition form and then send those samples to Vantari's Tempe fulfillment center. ROA. 23-40586.8092. From there, swabs covered by commercial insurers were sent to Vantari and Conn diverted the swabs covered by Medicare to Althea. ROA. 23-40586. 8092. To accomplish this, Jessica Conn would transcribe from the Vantari requisition form to the Althea requisition form. ROA. 23-40586.8093.

Evidence During the Resentencing Hearing Showed that Genematrix Representatives Consistently Marketed Althea (not Vantari) under Codon from April 2015 until 2016 With No Evidence that Requisitions Were Ever Switched From Vantari to Althea

During the resentencing hearing Patricia Courville testified about the Althea-Genematrix relationship and Codon.

i. *SD 300 Series: Emails with Genematrix Sales Representatives Marketing Althea*[14]

Courville testified, with the corroboration of more than 18 emails and commission reports, that dozens of Genematrix sales representatives

---

[14] Beginning here until the Summary of the Argument, Appellant cites to the ROA portions of the record from the Electronic Record on Appeal which are **ROA. 2886-3119 (Exhibits introduced during resentencing hearing); ROA. 10688-10898 (resentencing hearing); ROA. 3178-3180 (forfeiture order).**

marketed Althea tests to NY and NJ doctors. *See* ROA.2900-2925; ROA. 2928-2929.[15] Those emails included emails with Genematrix sales representatives who were marketing Althea under Codon umbrella including:

- Jerome Moe
- Stephen Tempone
- Phil Falcini
- Augustine Gomez
- Bob Ragot
- Barbara Schullman
- Ken Ropke
- Tiffany Luzuriagga
- David Brown**
- David Riethmiller
- Clarke Laggerman
- Timothy Tormey

ROA.2900-2925; ROA. 2928-2929. On behalf of Genematrix, Mrs. Courville served as the conduit between these sales representatives and

[15] *See also* admitted Exhibits SD 302, 304, 306-319 and 321.

Althea to ensure that the process of ordering Althea tests was handled correctly. ROA.10771, ROA. 10773-10775. That sales representatives had adequate supplies. ROA. 10771, ROA. 10773-10776. That questions about Althea tests that the sales representatives had were answered. ROA 10771, ROA.10773-10776. That sales representatives were apprised of any issues that Althea had with samples, supplies, or missing information. ROA. 10771, ROA. 10773-10776. Courville also assisted with the commission reports and helped to ensure Rachael Buckner had the necessary information from Althea to formulate commission reports. ROA.10771, ROA.10773-10776.

Althea samples and supplies were sent directly to the doctors' offices in New York and New Jersey. ROA.10776-10778. Communications between Courville and those Genematrix sales representatives marketing Althea highlighted this point. ROA. 2900-2925; ROA. 2928-2929. There were emails including FedEx tracking numbers confirming the receipt of the Althea supplies at those doctors' offices. ROA. 2917-2921; ROA. 2923. One of those emails was related to a New York doctor's office arranging FedEx pickups of Althea samples from the office to ship to Althea. ROA. 2924; ROA. 10795-10796. The sales representative

associated with that office was a Genematrix-Althea-Codon representative from a company named Genomics, Bob Ragot. ROA. 2924; ROA. 10795-10796.

Mrs. Courville testified that there was no evidence that the doctors associated with these sales representatives ever ordered a Vantari test for any patient at any time that was ever then switched to Althea. ROA. 10787:1-7, ROA. 10802:1-6, ROA.10807:1-4. Courville also testified that prepaid labels from FedEx were shipped to the doctors' offices who marketed Althea and so to divert a sample an insider at the doctor's office would have to remove the FedEx labels. ROA. 10795. Courville had no knowledge of that occurring. ROA. 10776-10777, ROA. 10795:3-15. And nobody ever testified that it happened at any of these offices associated with Genematrix, Mr. Donofrio, or any of the hard-working sales representatives marketing Althea for Genematrix under Codon.

*ii. SD 601-601A and SD 700, SD 701-701A: Linking the Althea-Codon Commission Reports to these Sales Representatives*

Almost all of these sales representatives' names appeared under CSO-Codon in the Codon-Althea commission reports prepared by Althea employee, Brittany Boyle and sent to Mrs. Courville. ROA. 3007-3118.[16]

Mrs. Courville also reviewed every single Althea-Codon commission report from April of 2015 until 2016, which comprised 10 reports. Resent ROA. 10817-10819. Courville testified that she then combined each of those commission reports to create a master Althea-Codon commission report which was introduced as SD 700. ROA. 10817-10819.

Importantly, Mrs. Courville identified each of those representatives as having marketed Althea, not Vantari. ROA. 10825-10826. Courville was shown a list of all the Genematrix sales representatives who were actively marketing Vantari tests in 2015. ROA. 2926-2927.[17] Mrs. Courville testified that none of those sales representatives were marketing Althea and none of the Genematrix representatives marketing Althea were marketing Vantari. ROA. 10798-10800. Mrs. Courville testified that there was no overlap between the Genematrix sales

---

[16] SD601-601A

[17] SD 320-320A

representatives marketing Vantari (ROA. 2926-2927) and those marketing Althea through Codon. ROA. 10817-10822 (discussing Althea Codon commission reports and reps); *compare with* ROA. 10799:5-16 (testifying that Genematrix reps marketing Vantari were distinct from those marketing Althea). Notably, Courville testified:

> Q. I showed you that exhibit earlier, 320, with all the reps in 2015 that were marketing Vantari, right?
> A. Yes.
> Q. There is no overlap between rep groups, right?
> A. Correct.
> Q. In other words, the folks that are on the Althea/Codon commission report are not the same people that are on the Vantari commission reports that Genematrix did?
> A. Correct.[18]

Beyond this, Althea's internal spreadsheet emailed by Noah Nasser when filtered to show Codon as the CSO in Column F also revealed that the Genematrix reps that marketed Althea May 2015-March 2016 under the CSO Codon were *not* the same as those marketing Vantari.[19] ROA. 3119; ROA.10798-10800, ROA.10817-10822. That Exhibit was introduced as SD 701A. ROA. 3119. That Exhibit also showed that many

[18] ROA. 10826:16-25
[19] See SD 701-701A.

of the sales representatives who were marketing Althea for Genematrix were under the Codon CSO (see ***next page***).[20]

| Last_Sample_Received | Sample Count | Physician Name | Client ID | Account_Manager | CSO | A |
|---|---|---|---|---|---|---|
| 3/2/2016 | 192 | Gerhard Maale | GMaale37 | Augustine Gomez | CODON | 4 |
| 6/26/2015 | 163 | Wekesa King'Asia | WAsia287 | Jerome Moe | CODON | 17 |
| 8/26/2015 | 50 | Gustavo Day | GDay478 | Bill Flowers | CODON | 7 |
| 12/2/2015 | 45 | Thomas Cipolla | TCipolla73 | Stephen Tempone | CODON | 3 |
| 8/18/2015 | 38 | Noor Gajraj | NGajraj289 | Bill Flowers | CODON | 4 |
| 2/24/2016 | 30 | Brian Durkin | BDurkin241 | Phil Falcini | CODON | 7 |
| 7/15/2015 | 28 | Garo Avetian | GAvetian79 | Gregg Howard | CODON | 1 |
| 6/16/2015 | 27 | Asia Lo | ALo800 | Bill Flowers | CODON | 1 |
| 8/24/2015 | 23 | James Jacobs | JJacobs881 | Bill Flowers | CODON | 1 |
| 11/17/2015 | 21 | Gary Buck | GBuck395 | Clark Lagemann | CODON | 1 |
| 12/1/2015 | 21 | Jeffrey Lape | JLape482 | Bob Ragot | CODON | 5 |
| 12/14/2015 | 21 | Andrew Hararah | AHararah197 | Matthew Simone | CODON | 3 |
| 1/12/2016 | 19 | Carla Pianka | CPianka158 | Clark Lagemann | CODON | 1 |
| 8/20/2015 | 18 | Cristina Bartis | CBartis695 | Bill Flowers | CODON | 4 |
| 7/24/2015 | 17 | Pankaj Garg | GPankaj430 | Bill Flowers | CODON | 1 |
| 6/24/2015 | 17 | Murtaza Mussaji | MMussaji318 | Bill Flowers | CODON | 11 |
| 9/2/2015 | 16 | James Telonis | JTelonis196 | Bob Ragot | CODON | 5 |
| 8/18/2015 | 15 | Peter Gulati | PGulati477 | Bill Flowers | CODON | 1 |
| 3/2/2016 | 13 | Stephen Nurkiewicz | SNurkiewicz235 | Matthew Klemic | CODON | 8 |
| 1/7/2016 | 11 | Scott Pello | SPello529 | Clark Lagemann | CODON | 1 |
| 1/12/2016 | 11 | Danielle Alesso | DAlesso685 | Clark Lagemann | CODON | 1 |
| 7/13/2015 | 10 | David Zelefsky | DZelefsky297 | Barbara Schulman | CODON | 2 |
| 8/7/2015 | 10 | David Zelefsky | DZelefsky810 | Barbara Schulman | CODON | 1 |
| 8/14/2015 | 10 | Daren Guertin | DGuertin324 | Bill Flowers | CODON | 3 |
| 1/12/2016 | 9 | Matthew Lesneski | MLesneski457 | Clark Lagemann | CODON | 1 |
| 1/28/2016 | 9 | Emmanuel Gelin | EGelin433 | Mark Benveniste | CODON | 3 |
| 6/2/2015 | 8 | Ebrahim Sadighim | ESadighim780 | Barbara Schulman | CODON | 1 |
| 10/19/2015 | 8 | Edvardo Yambo | EYambo877 | Michael DiFrancesca | CODON | 6 |
| 6/16/2015 | 8 | Samuel Mendicino | SMendicino285 | Bill Flowers | CODON | 1 |
| 1/28/2016 | 7 | Jason Capra | JCapra889 | Bo Farley | CODON | 3 |
| 10/6/2015 | 7 | Zachary Vaugh | ZVaugh124 | Jason Megginson | CODON | 2 |
| 12/14/2015 | 7 | Andrew Medvedovsky | AMedvedovsky68 | Clark Lagemann | CODON | 1 |
| 12/29/2015 | 7 | Adam Schreiber | ASchreiber297 | Clark Lagemann | CODON | 1 |
| 12/9/2015 | 6 | Garry Silvesti | GSilvesti915 | Clark Lagemann | CODON | 1 |
| 1/7/2016 | 6 | Richard Domsky | RDomsky433 | Clark Lagemann | CODON | 1 |
| 7/17/2015 | 6 | William Dulin | WDulin182 | Bill Flowers | CODON | 6 |
| 12/10/2015 | 5 | Brittany Christian | BChristian553 | Clark Lagemann | CODON | 1 |
| 6/18/2015 | 5 | Sajid Khan | SKhan28 | Bob Ragot | CODON | 2 |
| 1/21/2016 | 5 | Jason Stepkovitch | JStepkovitch806 | Hugo Robles | CODON | 7 |
| 7/9/2015 | 5 | Gabriel Maislos | GMaislos485 | Bill Flowers | CODON | 7 |
| 7/20/2015 | 5 | Scott Harris | SHarris462 | Bill Flowers | CODON | 6 |
| 6/19/2015 | 4 | Farzad Tabibzadeh | FTabibzadeh86 | Barbara Schulman | CODON | 2 |
| 7/8/2015 | 4 | Mark Jagust | MJagust522 | Michael DiFrancesca | CODON | 2 |
| 8/11/2015 | 4 | Mark Mazzye | MMazzye6 | Bob Ragot | CODON | 5 |
| 8/25/2015 | 4 | David Spingarn | DSpingarn633 | Gary Traynor | CODON | 3 |
| 11/20/2015 | 4 | Jason Stepkovitch | JStepkovitch988 | Hugo Robles | CODON | 1 |
| 6/12/2015 | 4 | Candice Winful | CWinful660 | Bill Flowers | CODON | 4 |
| 6/29/2015 | 4 | Andrew Selzman | ASelzman726 | Bill Flowers | CODON | 9 |
| 11/19/2015 | 3 | Nikunj Mehta | NMehta308 | Bob Ragot | CODON | 9 |
| 5/15/2015 | 3 | Vanessa Jeffers | VJeffers492 | Jerome Moe | CODON | 17 |
| 10/20/2015 | 3 | Yakov Raufov | YRaufov135 | Ken Ropke | CODON | 1 |
| 12/28/2015 | 3 | Sofia Din | SDin453 | Bob Ragot | CODON | 9 |

### *iii. SD 400 Series: Signed Requisition Forms Ordering Althea from NY and NJ doctors*

Courville also testified about signed requisition forms from multiple New York and New Jersey doctors showing they had authorized (and their patients had authorized) Althea to conduct pharmacogenomic

[20] ROA 3119 (excel native version to be provided to court).

testing. ROA.2930-3006; ROA.10808-10816.[21] Equally as important, Courville testified about 24 separate Althea Global Health Authorization forms, ROA. 2983-3006,[22] that were signed by the ordering physicians, many of whom were from Texas, were associated with sales representative Bill Flowers and ALS (who the government dismissed from the Indictment) and/or Ana Taylor and were included in the Althea-Codon reports about which Mrs. Courville testified.

*iv. Jason Rennie Testified That He Had Obtained Evidence, at Most, of 1 Patient Whose Requisition Was Switched from Vantari to Althea*

At the resentencing hearing, Agent Rennie testified he had not identified a single forged form. ROA. 10740:6 ("We did not obtain a forged form") including no forged Althea Global Health Authorization Forms (ROA.10742). Rennie also could not identify a single requisition that had been switched from Vantari to Althea (which is the scheme for which Mr. Donofrio was convicted) for a single patient or Medicare beneficiary except "maybe" patient K.B. from Dr. Bartis:

---

[21] SD 401-406.
[22] SD 406

Q. Sure. Okay. So ***can you tell this Court the names of any patients whose requisition forms at any time as part of this scheme were switched to -- from Vantari to Althea?***
***A. Well, based upon the evidence, Ms. Barlow and the doctor, Ms. Bartis.***
Q. Okay. Beyond that, any other patients?
A. No.
Q. Okay. Can you name any doctors whose requisitions may have been switched from Vantari to Althea meaning the doctor orders a Vantari test and has that test unknowingly switched to an Althea form and then Althea sends it off to Medicare, private payor, whoever? Any doctors?
A. So they ordered a Vantari test?
Q. They ordered a Vantari tests that gets switched to Althea.
A. Dr. Bartis.
***Q. Dr. Bartis. Beyond Dr. Bartis, any other doctors that you can name or identify for this Court in the context of your investigation where that would have happened?***
***A. No***. That and the trial testimony and the emails is proof enough that it was occurring.
Q. Okay. Occurring with respect to which doctors and which patients beyond Barlow and Bartis? I'm asking you.
A. Well, the testimony of Nicolas Arroyo said that it was happening on an ongoing basis.
Q. Right. On an ongoing basis with respect to which doctors and which patients?
A. ***The only one I know about is Ms. Bartis.***
Q. ***Right. That's the only one that you can tell this court about, right?***
A. ***It's the only evidence that we received related to the test requisition scheme***, in addition to co-conspirator testimony and email support that Mr. Donofrio was involved.

ROA.10761:16-10762:16.

Agent Rennie encountered other problems on cross examination:

- Rennie could not identify a single doctor in New York who would have ordered a Vantari test and had that Vantari test requisition form switched to Althea form (ROA.10743). This includes ordering physicians listed in the Althea Codon Commission reports, listed in the requisition forms (SD 400 series), or who practiced in New York or New Jersey.

- Rennie could not identify a single doctor in New Jersey who would have ordered a Vantari test and had that Vantari test requisition form switched to Althea form (ROA.10743). This includes ordering physicians listed in the Althea Codon Commission reports, listed in the requisition forms (SD 400 series), or who practiced in New York or New Jersey.

- Rennie did not interview any of the doctors listed in the Althea-Codon commission reports that would have been the ordering doctors for the lab requisition scheme (ROA.10743-10745).

- Rennie did not know if he ever interviewed a patient who had an Althea test (ROA.10746)

- Rennie did not know any of the Genematrix sales representatives marketing Althea or who were listed on any Althea-Codon commission report. ROA. 10746-10747.

**July 28, 2015**: Althea Compliance Concerns with Dr. Bartis' Multiple Swabs and One Vantari and One Althea Form

On July 28, 2015, Noah Nasser from Althea sent an email to Mr. Donofrio and Mrs. Courville which expressed compliance concerns about Bill Flowers' missing signatures on Althea's Global Health Provider Authorization Form. ROA.23-40586.14086. Patricia Courville from Genematrix collected the missing signatures from the marketing organizations associated with Bill Flowers. ROA. 23-40586.14087- 14095. One of those missing signature forms was for Dr. Cristina Bartis, which was provided by Ana Taylor on July 29, 2015, a sales representative associated with Bill Flowers, to Patricia Courville. ROA. 23-40586.14088-14091.

On September 15, 2015, Noah Nasser from Althea emailed Mr. Donofrio advising that there were compliance concerns with Bill Flowers' account with Dr. Bartis, including an incomplete TRF Form for Althea and a TRF form for Vantari relating to patient K.B. ROA. 23-40586.11457-11458. Mr. Nasser advised that the office has "never used Althea and they do not use our [Althea's] swab." ROA. 23-40586.11457-11458. Mr. Donofrio forwarded the email to Mr. Arroyo and demanded "Need to know what is going on.." ROA. 23-40586.11457.

These issues about patient K.B. and Dr. Bartis crystallized during the resentencing hearing on August 19, 2025. Special Agent Jason Rennie was asked about Dr. Bartis' patient K.B. who was the supposed patient whose requisition was switched. ROA. 2897-2899.[23] Rennie was shown a copy of patient K.B.'s Blue Cross Blue Shield card, ROA. 2897-2899, to illustrate that K.B. was *not* a Medicare beneficiary. Agent Jason Rennie speculated that she could be a Medicare beneficiary but ultimately testified that "***My point is you asked if she's a Medicare recipient. I can't make that determination***." ROA. 10754:14-16.

And when Rennie was confronted with a facsimile sheet showing that the Vantari form for Dr. Bartis' patient K.B. was sent from Lumin Health in Texas directly to Althea's office in San Diego via facsimile, ROA. 2900, Rennie was unable to testify that K.B.'s lab requisition was switched in Arizona through the supposed Jess Conn requisition switching scheme (if at all) since he agreed that the facsimile showed it was sent directly from Texas to San Diego. ROA. 2900; ROA. 10755-10757.[24]

---

[23] SD 185.

[24] Agent Jason Rennie agreed that no claim to BCBS was ever submitted for patient K.B. in connection with that lab order. ROA. 10752:21-24

Finally, Agent Rennie agreed that Althea never submitted a claim to Medicare for the Dr. Bartis' order for patient K.B. ROA.10752.

On **September 16, 2015** at 11:05 EDT, Mr. Marchetti emailed Mr. Arroyo and Mr. Donofrio the same Althea Global Health Provider Authorization Form that Ana Taylor had sent to Patricia Courville on July 29, 2015, attaching an Althea Global Health Provider Authorization Form purportedly signed by Dr. Bartis. ROA. 23-40586.14096-14097.

During the resentencing hearing, Mrs. Courville testified that she received each of the missing Althea Global Health Provider Authorization Forms, including the Bartis form and many other forms containing physician signatures from Ana Taylor. Mrs. Courville further testified she believed these were authentic forms. ROA 10806-10807. The government introduced no evidence in rebuttal.

## SUMMARY OF THE ARGUMENT

Against the backdrop of this Circuit's decisions in *United States v. Donofrio,* 2025 WL 1443577 (5th Cir. May 23, 2025) (*Donofrio I)*; *United States vs. Marchetti,* 96 F. 4th 818 (5th Cir. 2024), the offense of conviction in this case is the agreement to violate the Anti-Kickback statute which had, as its unlawful object, the goal of violating the Anti-Kickback

statute. This court held twice that the only unlawful object sufficient to state a violation of the Anti-Kickback statute was Codon-Althea diversion scheme also known as the Vantari-Althea requisition switching scheme:

> Arroyo developed a scheme in which Codon packaged Althea test swabs in kits with Vantari forms. Medical providers, believing that they ordered a Vantari test, would instead unknowingly use an Althea test swab. The medical providers would then send the Althea test and Vantari forms to a distribution center in Tempe, Arizona. At the distribution center, a Codon employee divided the tests into those billed to private insurance and those billed to Medicare. If the test was billed to private insurance, they would forward it to the Vantari lab. But if it was billed to Medicare, they would repackage the test to resemble one from Althea and ship it to Althea's lab. Althea would then pay Codon a fifty percent commission on the Medicare reimbursements.[25]

This Court sustained the kickback convictions of Mr. Donofrio and Mr. Marchetti based on this conduct, not any agreement to pay sales and marketing professionals to advertise and educate physicians about Vantari's pharmacogenetic tests which prevent patient death. *Donofrio,* 2025 WL 1443577 at* 9-10; *Marchetti,* 96 F. 4th 818.

---

[25] *Donofrio,* at *3-4 *see also Marchetti,* 96 F. 4th 818.

In so doing, this Court found that there was sufficient evidence to sustain Mr. Donofrio's conviction only because a reasonable juror could have found that Donofrio willfully agreed to the unlawful object in the Codon-Althea diversion scheme which was to exercise undue influence over the patient's selection of pharmacogenetic testing. *Donofrio,* at *11. Plainly, Jess Conn made that decision when she switched Vantari requisition forms which doctors had signed to authorize *those Vantari tests* to Althea forms which doctors had never signed or authorized for those patients. All without the patient's knowledge or consent.

In reaching this conclusion, the court said nothing about the two issues that Mr. Donofrio raises with the court now. First, how to calculate the value of the bribe derived from this diversion scheme. Second, how to calculate the forfeiture amount tied to this Codon-Althea diversion scheme.

During the resentencing, the district court clearly erred by assuming that the total payments from Althea to Codon was a correct calculation of the value of the bribe under 2B4.1. There was no reliable evidence that all, a large portion, or any quantifiable amount of the monies from Althea to Codon were derived from the requisition scheme.

Indeed, there was no evidence that *any of* those monies from Althea to Codon were derived from the conduct of Jess Conn (or any other person in the world) switching a Vantari lab requisition order to an Althea lab requisition order. That was the unlawful object upon which Mr. Donofrio's conviction was affirmed in *Donofrio I.*[26] The district court was therefore required to analyze the evidence and ensure that the government satisfied its burden of proving the *value of the bribe*. The district court erred by simply assuming – even in the face of dozens of exculpatory emails – that Althea to Codon monies were tied to lab requisitions which Jess Conn or any other person switched from Vantari to Althea.

---

[26] To affirm though, the jurors could have found $10 was paid from Althea to Codon and then to Genematrix as part of the lab requisition switching scheme. At resentencing though, the court had to find by reliable and specific evidence that the $109,000 represented proceeds from the Vantari-Althea requisition scheme.

## ARGUMENT AND AUTHORITIES

### ISSUE ONE: THE DISTRICT COURT CLEARLY ERRED IN FINDING THAT THE VALUE OF THE BRIBE AMOUNT UNDER 2B4.1 WAS $109,000 BASED ON A PREPONDERANCE OF EVIDENCE.

Standard of Review

The district court's application of the Sentencing Guidelines is reviewed *de novo*. Findings of fact are reviewed for clear error. The sentence imposed is reviewed for reasonableness. *United States v. Ricard,* 922 F.3d 639, 657 (5th Cir. 2019). In addition, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez v. United States*, 578 U.S. 189, 198 (2016) (noting that a district court that "improperly calculat[es]" a defendant's Guidelines range, for example, has committed a "significant procedural error.").

In deciding what the value of the bribe is, the court was required to find by a preponderance of the evidence that the value of the bribe was $109,000. The preponderance of the evidence is not a "toothless standard" and "[i]t is the district court's duty to ensure that the Government carries

this burden by presenting reliable and specific evidence." *United States v. Lawrence,* 47 F. 3d 1559, 1566 (11th Cir. 1995). Indeed, "[w]hen a defendant challenges one of the factual bases of his sentence as set forth in the PSR, the Government has the burden of establishing the disputed fact by a preponderance of the evidence." *Lawrence*, at 1566.

The government has the burden of introducing specific and reliable evidence to supports its recommended value of the bribe figure, not the defense. This is no different than the burden the government carries to prove a loss under Section 2B1.1, *see United States v. Ayika,* 837 F.3d 460, 467 (5th Cir. 2016) (government has burden of proof to show loss), or a drug quantity under Section 2D1.1.

At the resentencing, Mr. Donofrio was not seeking a departure or adjustment to his Guidelines where Mr. Donofrio would carry the burden of proof. *See e.g. United States vs. Alfaro*, 919 F.2d 962. 965 (5th Cir. 1990) (reiterating in the context of an acceptance of responsibility adjustment that the "party seeking an adjustment to prove the necessary facts by the preponderance of the evidence."). Instead, Mr. Donofrio rebutted the government's proposed $109,000 figure.

Argument

The government failed to introduce any evidence to support the court's finding by a preponderance of the evidence that the value of the bribe under 2B4.1 was $109,000.

To begin with, the district court admitted that the government's approach did not "approach mathematical." ROA 10864. Next, the government's lead special agent (who the defense called) admitted he could not tie a single patient (let alone Medicare patient) to the Vantari-Althea requisition scheme except Dr. Bartis and patient K.B. ROA 10761-10762. In fact, Rennie admitted that he could not identify a single patient who had a doctor order a Vantari test, that was then switched to Althea test order other than maybe Dr. Bartis and patient K.B. ROA 10761-10762.

This is incredibly significant. Why? The government argued that the value of the bribe is directly tied to the amount of money Althea paid Codon ($109,000). And that money from Althea to Codon (and ultimately to Genematrix) was supposedly tied to a lab requisition switching scheme involving Jessica Conn switching Vantari orders to Althea orders for

Medicare patients in Arizona which is the factual basis for affirming Mr. Donofrio's conviction in *Donofrio I* at*9-12.

A visual aid illustrates these points on the ***next page***:




There was no evidence at the resentencing hearing that any of the doctors in the Codon-Althea commission reports -- who were tied to Genematrix sales representatives marketing Althea to those doctors – ever ordered a Vantari test. That should end this analysis. If there were

no Vantari forms that ever reached any of the doctors' offices that Patricia Courville testified about (where those doctors were clearly ordering Althea tests) how could the court have found that $109,000 was attributable to Steven Donofrio as the value of the bribe? The court would have to have found that the Step 5 monies Althea received were from the requisition switching scheme. The court did not.

The government was required to demonstrate that the doctors to whom the Genematrix representatives or the ALS representatives under the CSO Codon marketed Althea had their orders switched up. That someone from either organization funneled their Vantari PGX order to Arizona so Jess Conn could switch the Vantari PGX order to Althea and send it to Althea for billing to Medicare which was then paid to Codon. There was no such reliable or specific evidence of this ever happening in connection with any identifiable patient except maybe K.B. and Dr. Bartis. Even that is a stretch given that Rennie testified that the requisitions were faxed directly from Texas to Althea with no connection in Arizona. ROA.10755-10756. And Althea never submitted a claim to Medicare for that sample. ROA. 10752

And, in stark contrast to the absence of evidence introduced to support the government's figure, the defense presented dozens of Exhibits, including requisition forms for Althea, Althea-Codon commission reports, and email traffic showing that Genematrix sales representatives marketing under Codon were marketing Althea to specific doctors. ROA. 2901-ROA 3119. Take Jerome Moe, Augustine Gomez, and Stephen Tempone – 3 of the more successful marketers of Althea. They communicated with Patricia Courville about marketing Althea, obtaining supplies and swabs from Althea, and the test results from Althea as did sales representatives Barbara Schulman, Phil Falcini, Clark Laggeman, and Bob Ragot, among others. ROA. 2901-2925; ROA. 2928-2929. Incredibly, the Bob Ragot email asking when Althea is going to pick up Althea samples to FedEx directly from the doctors office to Althea (ROA.2924) belies the entire premise that Genematrix and/or its representatives who were marketing Althea had any involvement in any requisition scheme. [27]

[27] The government will protest that Mr. Donofrio is seeking to reverse his conviction. Not so. Mr. Donofrio is highlighting the fundamental problems with this requisition switching theory as it relates to any Genematrix sales representative. Each representative was marketing Althea – many of whom were included as members of the CSO Codon on each of the Codon-Althea commissions reports that Courville testified about. And, it could be that some requisitions were switched by Jess Conn.

Here, based on the above, Mr. Donofrio rebutted any assertion by the government that doctors --- to whom sales representatives from Genematrix marketed Althea under Codon – had their requisitions orders switched from Vantari to Althea. It simply never happened with respect to those doctors.

It could have happened with respect to certain doctors (for example Dr. Bartis) associated with sales representatives of Bill Flowers (who the government dismissed from the indictment). Althea complained about requisitions from doctors' offices tied to Bill Flowers' marketers, not Donofrio's marketers at Genematrix. ROA. 2886-2996. The requisitions that were flagged by Althea sales president Noah Nasser in the well-known email from July 29, 2015 to Donofrio were also tied to Flowers Marchetti and ALS, not Donofrio. ROA.10748-10750. Yet, neither the court nor the government addressed that or sought to advance a figure as to how much money was paid from Althea to Codon for requisitions that Bill Flowers or his supposedly unscrupulous sales representatives

---

Mr. Donofrio's observations do not undermine this court's finding in *Donofrio I* about Mrs. Conn. But simply because this court made that finding does not mean that the district court could attribute the entire amount of monies from Althea to Codon to Donofrio and find that the value of the bribe under 2B4.1 was $109,000 when the government has yet to identify a single patient whose requisition was switched by Conn (or any other person) except Patient K.B. Maybe.

(possibly in coordination with Vince Marchetti and Jess Conn) supposedly switched from Vantari to Althea. One possible proposal would have been to include all of Bill Flowers' Medicare samples to Althea which netted about $28,000.00 (ROA.3007-3115)[28] and to argue that was relevant conduct under U.S.S.G. Section 1B1.3(a)(1)(B) within the scope of Mr. Donofrio's "jointly agreed" conduct. The government never asked for that figure and never advanced that argument.

In conclusion, the government failed to introduce any reliable or specific evidence that permitted the district court to engage in an analysis that even "approached mathematical." ROA.10864. Agent Rennie's testimony revealed that the government failed to obtain evidence to support the figure. ROA.10761-10762. By contrast, Mr. Donofrio produced dozens of exhibits which undermined the government's value of the bribe figure. ROA. 2886-3319. In fact, evidence demonstrated that Genematrix's side of the house and its marketers under Codon marketing Althea were marketing Althea not sending 2 different requisitions to doctors and had absolutely no involvement in

[28] That number would have netted a Guideline range of base offense level 8 plus 4 for a total offense level of 12 (10-16 months). Mr. Donofrio served 14 months in prison.

any requisition switching scheme or connection to Jess Conn. ROA. 10688-10898; ROA.2886-3119.

Armed with no specific and reliable evidence to support the $109,000 figure, the government asked the court to assume that the total deposits from Althea to Codon ($109,000) were premised on a lab requisition switching scheme that they failed to prove. In finding that the $109,000 was a "reasonable estimate" (ROA.10863) the district court committed clear error because it assumed the speculative conclusion that the government asked the court to draw.

## ISSUE TWO MR. DONOFRIO'S FORFEITURE ORDER MUST BE VACATED BECAUSE THE DISTRICT COURT SPECULATED AS TO THE TOTAL AMOUNT OF MONIES OBTAINED DIRECTLY OR INDIRECTLY BY MR. DONOFRIO FROM THE OFFENSE OF CONVICTION

### Standard of Review

Criminal forfeiture is "an aspect of punishment imposed following conviction of a substantive criminal offense," *Libretti v. United States,* 516 U.S. 29, 39 (1995), and an "aspect of sentencing. The district court's findings of fact pertaining to a forfeiture order must be reviewed "under the clearly erroneous standard," and "the question of whether those facts constitute legally proper forfeiture are reviewed *de*

*novo*." *United States v. Juluke,* 426 F.3d 323, 326 (5th Cir. 2005); *Ayika*, 837 at 468-69.

Argument

For many of the reasons that the sentence must be vacated, the forfeiture order of $84,213.19 must be vacated too.

The plain language of Section 982(a)(7) unambiguously requires the government to prove that the forfeiture amount "constitutes or is derived directly or indirectly from gross proceeds traceable to the commission of the offense." *See* 18 U.S.C. Section 982(a)(7).

The "offense" means the offense of conviction which was based *solely* on a Codon-Althea requisition switching scheme where, as the object of that scheme, orders (requisitions) for Vantari PGX tests were switched to orders for Althea PGX tests for Medicare beneficiaries. And, "traceable" means what it says. *See United States v. Polin,* 690 F. Supp. 2d 415, 427-28 (W.D. Va. 2010) ("For gross proceeds to be "traceable" to the offense they must be able to be tracked back to the commission of the crime; that is to say, there must be some nexus between the money sought and the health care offense. *See Blacks Law Dictionary* 1499 (7th ed. 1999) § defining the word "tracing" as ("the process of tracking

property's ownership or characteristics from the time of its origin to the present.”).”).

*United States v. Ayika* 837 F.3d 460, 472-74 (5th Cir. 2016) reinforces the importance of tracing property the government seeks to forfeit to the offense of conviction under Section 982(a)(7). There, following a health care fraud conviction, this Circuit vacated the forfeiture order holding that the “Government has failed to prove that it is, more likely than not, that the funds remaining in that account are traceable to Ayika's healthcare fraud against the six insurers.” *Ayika,* at 474.

*United States v. Dass,* 2023 WL 1529713 (5th Cir. Feb. 3, 2023) is also instructive. There, the money judgment in a kickback case was vacated because “the record supports, that the imposition of the $928,621.16 money judgment was a clear and obvious error because it included proceeds that were not traceable to Dass's $7,710 healthcare kickback offense.” *Dass,* at*2.

Applying these principles to this case, the forfeiture judgment must be vacated. ROA. 3178-3180. The court incorrectly noted that Mr. Donofrio had a "fraudulent company" and engaged in a "Medicare fraud conspiracy." stating that:

> [t]he evidence here demonstrated that Genematrix, a company co-owned and lead by Donofrio, had a relationship with Codon entirely based in the offense conduct, meaning any payments between the two companies are at least indirectly, if not directly, traceable to the commission of the Medicare fraud conspiracy. Donofrio's argument that one specific patient was not a Medicare recipient does not rebut the overall conspiracy or otherwise legitimize a subset of Genematrix's actions.

ROA. 3179. In opening statement, the government told the jury "***[i]ts not a healthcare fraud case. You're not here to decide whether or not the claims submitted to the Medicare program were fraudulent or not***." ROA.23-40586. 7757:8-10.

Mr. Donofrio was never involved in Medicare fraud (which was never charged). The payments from Codon to Genematrix were not to a "fraudulent company." Not even the government suggested that Genematrix engaged in fraud. And in *Donofrio I*, this Circuit found that the evidence at trial showed that Genematrix was a sales and marketing organization. *Donofrio I,* at *10 ("Donofrio was advertising in the eyes of

the AKS.") Despite this, the district court found that because Genematrix was involved in "Medicare fraud conspiracy" that was never before the court or the jury, the monies from Codon to Genematrix "must be at least indirectly traceable to the commission of the Medicare fraud conspiracy" – a conspiracy that was never charged and which cannot support forfeiture. ROA. 3178-3180.

On this basis alone, the court can vacate this order. The district court ordered forfeiture based on a crime that was not charged and for which Mr. Donforio was never convicted by a jury. ROA. 3178-3180. There was no analysis of how to calculate the forfeiture amount or how the court found that the entire amount of $84,213.19 was traceable to Vantari-Althea requestion switching scheme. ROA.3178-3180. And the order directly contravenes this Circuit's directives to district courts in *United States v. Dass,* 2023 WL 1529713 (5th Cir. Feb. 3, 2023) and *United States v. Ayika* 837 F.3d 460, 472-74 (2016) requiring district courts to carefully calculate and trace monies derived from the offense of conviction. The district court assumed the money was traceable to an uncharged "Medicare fraud conspiracy" and entered an order. ROA. 3178-3180.

For these reasons, the forfeiture order must be vacated.

## ISSUE THREE: THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DENIED MR. DONOFRIO'S REQUEST FOR A DOWNWARD VARIANCE UNDER 18 U.S.C. SECTION 3553(A).

Standard of Review

The court reviews the substantive reasonableness of the sentence under an abuse-of-discretion standard. *United States vs. Simpson,* 796 F. 3d 548, 558 (2015). A defendant may rebut the presumption that his Guideline sentence is reasonable by demonstrating that the sentence: "(1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *Simpson,* 796 F. 3d at 557-58.

Argument

The court denied a variance because Mr. Donofrio proceeded to trial and exercised his right to a jury trial twice. The court was careful not to frame it that way but said it was important to avoid unwarranted sentencing disparities between similar defendants. ROA 10886-10888. This was a clear error in judgment, reflects a decision to sentence Mr. Donofrio for going to trial, and a variance under 18 U.S.C. Section 3553(a) should have been granted.

Equally significant, the court had never seen so many letters from so many different people saying so many good things but still denied a variance. ROA.10873 ("I would in large part rely on the dozens of sentencing letters that were previously submitted to Your Honor about two years ago. And I believe that Your Honor's comment was something along the lines of Your Honor's never seen so many sentencing letters say so many things about someone. And that's literally the purpose behind a variance under 3553(a) based on the offender and the nature and the history and the characteristics of who Steven Donofrio is.").

The court should have granted a variance based on character of Mr. Donofrio since Mr. Donofrio had the most character letters the court had ever seen. ROA.23-40586, 10045 (The court remarked that the court had not seen a "Sentencing Memorandum as long as Mr. Feldman's or with as many attachments of letters of people who know you well, Mr. Donofrio, in all that time. …. I have absolutely no doubt that you are exactly the kind of person that the letters Mr. Feldman submitted to me have described you, almost all of those with great affection and all of those very important relationships. It -- it was moving to me to read Mr. Harrelson's letter that I received yesterday that describes the sort of

respect that he has for you as a former client and as a friend."). It abused its discretion when it declined to do so.

Finally, it is important to ask "what did Mr. Donofrio actually do?" Based on the record and construing the evidence and the *Donofrio I* opinion as we must, Mr. Donofrio was involved in a supposed Althea-Vantari-Codon scheme where none of the Genematrix sales representatives, or the doctors associated with those reps, ever had any requisitions switched. Donofrio was involved as follows: he introduced Arroyo to Althea executives, he provided Genematrix sales representatives who were marketing Althea where there was no evidence of any requisition switching, and he sent a cheat-sheet-email with documents from Glenn Castillo. On top of this, at worst, the total Althea to Codon to Genematrix monies was $84, 213.19 *less* the amount of money tied to Exceltox which even the government has said made up $22,696.55. [29] Of that $84,213.19, Donofrio earned one-third of those monies, at most, which is less than $30,000, because he was a 1/3 owner of Genematrix with Lissner and Rhode.

[29] Dkt. No. 1101 at Page ID 22076 (Govt Memorandum in Support of Forfeiture).

By comparison, the other defendants in this case were involved in much more serious conduct over a longer period. And Mr. Donofrio's $109,000 figure is the lowest of any defendant sentenced under Section 2B4.1 in this case. And, as discussed, the defense believes it should be much lower.

Arroyo was the lead defendant. Jimmy Walker, Chad Isbell, and Virginia Herrin paid doctors. Kim Willette received money for kickbacks paid to her and her husband-doctor (Roger Willette who was never prosecuted). Isbell (13 months), Walker (5 months), and Willette (13 months) all received lower sentences than Donofrio with higher 2B4.1 amounts.[30] Herrin pled to obstruction, but Herrin paid doctors to steer samples to Vantari. Ridgeway pled to misprision of a felony, but the amounts paid in the underlying conduct were several million.

Ashley Kretschmar made her sales commissions from Vantari based on her husband's orders – he was a doctor too – and was sentenced to probation. [31]Greg Petty was a two-time fraudster who billed Medicare for

---

[30] ROA.23-40586.13866 (SD 28), from ROA 23-40586 (SD 28) (table of defendants' sentences).

[31] ROA.23-40586.13866 (SD 28), from ROA 23-40586 (SD 28) (table of defendants' sentences).

dead patients and was sentenced to probation. Sean Parrish (an owner of Vantari and founder of Codon) was not prosecuted. Bill Flowers – Marchetti's right hand man[32] -- who was at the heart of the Codon-Althea agreement and who was responsible for each of the supposed problematic samples was dismissed from the indictment.[33] Phil Lamb as one of the owners of Vantari was sentenced to probation even with large 2B4.1 figures.[34]

Accordingly, based on both the nature and circumstances of Mr. Donofrio's offense and the fact that his conduct involved less money than any other defendant sentenced under U.S.S.G. Section 2B4.1 and did not involve payments to doctors, the court abused its discretion in not

[32] Marchetti was sentenced to 48 months and was the only other defendant who was convicted at trial. The court determined Marchetti was not a good comparator though and did not believe a 24-month sentence for Donofrio was an unwarranted disparity because they were not similarly situated. ROA. 10886-10887.

[33] *Id.* at note 27.

[34] Donofrio asserts that based on this Circuit's holdings in *Miles, Shoemaker, Marchetti* and *Donofrio* that the factual basis in Lamb's case no longer supports his conviction which is based entirely on paying monies to Walker for marketing Walker did for Vantari based on a percentage-based structure with no mention of undue influence over a patients' selection of services. This is precisely what this Circuit says cannot constitute the unlawful object of a kickback conspiracy. Lamb's conviction should be vacated.

considering these factors and denying Mr. Donofrio's motion for a variance.

## CONCLUSION

Mr. Donofrio's sentence and the forfeiture order must be vacated and remanded for recalculation.

*/s/ Andrew S. Feldman*

## CERTIFICATE OF SERVICE

I certify that the foregoing motion was electronically served on counsel of record through use of the Court's ECF system.

*/s/ Andrew S. Feldman*

## CERTIFICATE OF COMPLIANCE

Pursuant to 5th Cir. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of the 5th Cir. R. 32.2.7(b) and Fed. R. App. P. 32(f).

1. Exclusive of the exempted portion in 5th Cir. R. 32.2.7(b)(3) and Fed. R. App. P. 32(f), this brief contains 9943 words.

2. This brief has been prepared in proportionately spaced typeface using Microsoft Word for Microsoft 365 MSO (Version 2302) in Century Schoolbook typeface and 14-point font size.

3. The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in 5th Cir. R. 32.2.7, may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

*/s/Andrew S. Feldman*